

FILED
2022 Mar-29  AM 09:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **FRANKENMUTH MUTUAL** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:20-cv-1288-KOB** |
| | ) | |
| **FIVE POINTS WEST SHOPPING** | ) | |
| **CITY, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the parties' cross-motions for summary judgment. (Docs. 17, 18). Five Points owns a shopping center in Bessemer, Alabama. Five Points also holds an insurance policy with Frankenmuth, which covers damage to that property. On August 9, 2018, two men broke into 5 Points' building and attempted to steal copper wire. The attempted theft damaged 5 Points' building, and 5 Points filed an insurance claim for the estimated cost of the repairs. Frankenmuth's denial of that claim gives rise to this suit.

As explained below, the parties' Policy contains a Vacancy provision that excludes coverage for losses that occurred when 5 Points' building had been continuously vacant for 60 days prior to the alleged loss. *See* (Doc. 19-1 at 73). But the Vacancy exclusion does not apply if 5 Points' building was "under renovation"

or if 5 Points' tenant conducted its "customary operations" in the building. (*Id.*).
Unsurprisingly, the parties dispute whether 5 Points' building underwent
renovations and whether 5 Points' tenant conducted its customary operations at 5
Points' building during the 60 days before the attempted theft on August 9, 2018.

Frankenmuth filed this case seeking a judgment declaring that the Policy
provides "no coverage for the claim made by [Five Points] . . . as the vacancy
provision in the insurance policy excludes coverage for said claim." (Doc. 1 at 8).
5 Points filed a counterclaim seeking a judgment declaring that (1) "the Vacancy
provision of the insurance policy does not apply to [5 Points'] damage" and that
(2) "the insurance policy covers the damage suffered as a result of the attempted
theft." (Doc. 4 at 13). Five Points also claimed that Frankenmuth breached its
insurance contract with 5 Points by denying 5 Points' claim. (Doc. 4 at 11).

After discovery closed, the parties filed cross-motions for summary
judgment. (Doc. 17, 18). Frankenmuth seeks summary judgment as to its
declaratory judgment claim, arguing the vacancy exclusion applies; 5 Points seeks
summary judgment as to its declaratory judgment claim, asserting the vacancy
exclusion does not apply. Frankenmuth also moved for summary judgment as to 5
Points' breach of contract claim because 5 Points cannot prove damages under that
claim. Five Points then filed a motion to exclude an affidavit by James Goodgame
that Frankenmuth submitted in support of its motion for summary judgment. (Doc.

2

24). And Frankenmuth filed a motion to strike evidence that 5 Points submitted regarding the cost of repairs to its building. (Doc. 29).

For the reasons stated below, the court will deny both parties' motions for summary judgment, deny 5 Points' motion to strike, and find Frankenmuth's motion to strike to be moot. But the court will grant Frankenmuth's motion and enter summary judgment in Frankenmuth's favor as to 5 Points' breach of contract claim.

## BACKGROUND

### I.    The Policy

The parties' Policy provides, in relevant part:

**6. Vacancy**

**a. Description of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

3

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

### b. Vacancy Provisions

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

. . .

(e) Theft; or

(f) Attempted theft.

(Doc. 19-1 at 73).

## II.   **Factual Background**

Unless otherwise indicated, the parties do not dispute the following facts. But as explained below, the parties dispute whether 5 Points' building was under renovation and whether 5 Points' tenant conducted customary operations within 60 days before the attempted theft on August 9, 2018. In other words, much of this opinion turns on whether 5 Points' building was continuously vacant *from June 10, 2018* until August 9, 2018. So, the court closely attends to the timeline of events as it describes the facts below.

### a. Five Points' Lease with Winn-Dixie and Its Loss

Five Points owns a commercial retail building in Bessemer, Alabama. From approximately 1995 to 2018, 5 Points leased 44,000 square feet of the building to Winn-Dixie, an entity that operates grocery stores. Winn-Dixie's space constituted 73% of the 5 Points premises. In March 2018, Southeastern Grocers (SEG), which operates the Winn-Dixie chain, announced that it planned to file for Chapter 11 bankruptcy. As part of the bankruptcy, SEG's day-to-day operations included identifying underperforming stores, closing those stores, and selling their assets. SEG ultimately closed 94 of its 676 Winn-Dixie stores, including the store at 5 Points' building.

On April 16, 2018, the Winn-Dixie at 5 Points' building stopped selling groceries to the public. On April 26, 2018, SEG sent a letter to 5 Points stating that SEG was terminating its lease with 5 Points as permitted under a court order in the bankruptcy proceeding. The letter stated that SEG "surrendered possession and closed" the Winn-Dixie and that SEG "abandon[ed] any personal property to [5 Points] that may be remaining on the leased premises after April 30, 2018." (Doc. 21-8 at 2).

SEG also sold various fixtures and equipment from the former Winn-Dixie to Buy-Lo Quality Food Stores, Inc. These fixtures included large walk-in refrigerators and large compressor units to operate the refrigerators. Winn-Dixie

5

executed a Sale Agreement with Buy-Lo for these items on March 23, 2018. The Agreement states: "Buyer intends to remove the [fixtures] from the Property and does not intend to conduct any business at the Property." (Doc. 21-9 at 2). Winn-Dixie also executed a Bill of Sale, which transferred title of the fixtures to Buy-Lo, "effective as of April 30, 2018." (Doc. 21-10 at 2).

Because removing the coolers and compressors proved to be a lengthy task, those items remained in 5 Points' building after April 30, 2018. Buy-Lo hired McCormick Refrigeration to remove the refrigeration fixtures from the building. In May 2018, McCormick removed the walk-in coolers from the lower level of 5 Points' building. McCormick also removed the compressor units from the upper level of 5 Points' building, but the parties dispute the date of that removal. Removing the coolers and compressors required McCormick to also remove mortar blocks from the walls because those units were built into the walls of the building. Those blocks were later repaired, but the parties dispute the date of the repair and the entity that performed the repairs.

### b.  *The Repairs to 5 Points' Building*

Five Points now argues that the repairs to the mortar blocks constitute "renovation" under the vacancy exclusion of the parties' insurance policy. If so, the vacancy exclusion would not apply if those repairs occurred on or after June

10, 2018. But the parties hotly dispute the date that the mortar blocks were repaired and who performed those repairs.

Larry McCormick, representative for McCormick Refrigeration, testified that removing the refrigeration fixtures from 5 Points' building required his company to create three holes in the walls—two to remove the coolers and one to remove compressors. (Doc. 21-11 at 10). Deposing counsel showed Mr. McCormick pictures of all three holes. While looking at the pictures, McCormick clarified that the two lower-level holes resulted from removing the coolers, and the upper-level hole resulted from removing the compressors. (*Id.* at 7).

McCormick testified that he hired Goodgame Company, "a qualified construction company," to repair the three holes with mortar blocks and assist in some demolition work related to the building's sprinklers. (Doc. 21-11 at 6). Five Points' counsel specifically asked whether Goodgame repaired the upper-level hole for the compressors, and McCormick responded, "yes, sir, sure did." (*Id.* at 7).

When first asked about Goodgame's role in the repairs, McCormick pointed Frankenmuth's counsel to one of the deposition exhibits: "if you notice, you have a bill there for what they did and what I paid." (*Id.* at 6). The exhibit is an invoice from Goodgame Company to McCormick Refrigeration. (*Id.* at 21). The invoice states a cost of $4,324.80, and it describes Goodgame's work as "trip and labor

sprinkler and block work at old Winn-Dixie." (*Id.*). The invoice is dated July 1, 2018.

Importantly, McCormick could not recall the dates or months that his company or its subcontractors worked at 5 Points' building. (Doc. 21-11 at 5). He remembered that the work at 5 Points' building took roughly "three to four weeks," and that Goodgame's mortar block repairs occurred at a date "getting close to the end" of the entire project. (Doc. 21-11 at 8). McCormick testified:

> Q: Okay. And you bricked up all three of those holes on the same day?
>
> A: Yes, sir.
>
> Q: Okay. And Goodgame—
>
> A: Well, it might have took them two days, but they blocked them all up pretty quickly.

(Doc. 21-11 at 10).

But one witness did state a date on which the mortar block repairs occurred. In March 2020, Frankenmuth subjected Marialana Watkins, representative for 5 Points, to an Examination Under Oath. (Doc. 21-12). Watkins testified that *on June 30, 2018*, she was at 5 Points' building and saw workers "knock a big hole in the back and took out some kind of refrigeration." (Doc. 21-12 at 17). She testified that, when she saw the hole, a McCormick employee who was on site assured her that he would repair the hole. (Doc. 21-12 at 18). Watkins then testified:

> Q: And when did they come back and repair the building?

A: The same day.

Q: How do you know this?

A: I was there. I waited for them to come back.

(Doc. 21-12 at 18).

When asked how she remembered the date of June 30, 2018, Watkins

testified, "I documented it because I thought that the people [that] were taking the

things out of the store were stealing them, but I didn't know that they had been

sold. . . . I just wrote [the date] on a piece of paper in my car." (Doc. 21-12 at 16).

Watkins stated that she no longer had that piece of paper.

Ms. Watkins's testimony regarding repairs on June 30 supports 5 Points'

argument that the building was under renovation after June 10, 2018. In response,

Frankenmuth disputes Watkins's testimony with the affidavit of Jason Goodgame,

Vice President of Goodgame Company. (Doc. 19-7).

### III.   Five Points' Motion to Strike the Affidavit of Jason Goodgame

Five Points moves to strike Jason Goodgame's affidavit and the document

exhibits attached to it. (Doc. 24). The court considers that motion now, as it

constructs the factual record.

Jason Goodgame's affidavit states that he was the project manager for the

repairs at 5 Points' building. He then makes several statements regarding the date

that his company completed repairs to 5 Points' building:

The coolers had been removed prior to May 14, 2018, because on May 14, 2018, M&B Masonry, who had been retained by Goodgame Company, Inc., replaced all of the damaged and/or missing blocks at the Winn-Dixie location located at 2200 Bessemer Highway, Ensley, Alabama 35010. All of the block work was completed on May 14, 2018. . . .

Goodgame Company, Inc. had completed all of its work at the Winn-Dixie location located at 2200 Bessemer Highway, Ensley, Alabama 35010 by May 14, 2018.

On June 28, 2018, Goodgame Company, Inc. invoiced McCormick Refrigeration for the work.

(Doc. 19-7 at 2–3). The exhibits attached to Mr. Goodgame's affidavit include Goodgame Company's invoices with various sub-contractors, each of which is dated no later than May 16, 2018. (*Id.* at 5–13).

As explained before, Mr. McCormick testified that he hired Goodgame to perform all mortar repairs. (Doc. 21-11 at 7). So Mr. Goodgame's affidavit stating a May 14 completion date arguably conflicts with Ms. Watkins's testimony about June 30 mortar repairs—a dispute which bears on whether the vacancy exclusion applies to 5 Points' losses on August 9, 2017.

Mr. Goodgame's affidavit is dated June 11, 2021. (*Id.* at 3). But discovery closed in this case on June 1, 2021.[1] Frankenmuth explains that it failed to acquire Mr. Goodgame's affidavit sooner because Frankenmuth did not "fully ascertain"

---

[1] Before June 1, the court granted the parties' joint motion to extend the discovery deadline, but the court made clear that it did so "*only* for the parties to take the 30(b)(6) deposition of [Frankenmuth] during the week of June 7 through June 11, 2021, and not for the parties to take any other depositions." (Doc. 15 at 1) (emphasis in original). So, as to Goodgame's affidavit and its exhibits, the discovery deadline remained June 1, 2021.

Goodgame Company's connection to the case until Larry McCormick's deposition on June 1, 2021, the last day of discovery. (Doc. 23 at 2).

Recognizing the affidavit's significance regarding the date of repairs to 5 Points' building, 5 Points quickly acquired a second affidavit from Jason Goodgame. Five Points attached the second affidavit to its reply for its motion for summary judgment and to its response to Frankenmuth's motion for summary judgment. (Doc. 23-1).

In the second affidavit, Mr. Goodgame states that he "reviewed the pictures attached as Exhibits A and B." (Doc. 23-1 at 2). Exhibit A is the same photograph that Larry McCormick explained as depicting the holes created to remove the compressors from the upper level of 5 Points' building. *Compare* (doc. 21-11 at 24–25) *with* (doc. 23-1 at 4–5). And Exhibit B is a photograph of mortar block repairs to that same hole. Mr. Goodgame then testified:

> 5. I have no recollection of Goodgame Company or any subcontractors hired by Goodgame Company performing any of the work shown in the pictures, including any masonry work shown in Exhibit A or B.

> 6. My June 11, 2021 affidavit related to this case is based on my knowledge and recollection of other work performed at the Winn-Dixie location.

(Doc. 23-1 at 2–3). Frankenmuth did not move to strike this second affidavit.

Five Points argues that the court should strike Jason Goodgame's first affidavit and its exhibits because Frankenmuth failed to produce those documents

in the discovery process. (Doc. 24 at 8). The parties devote much of their briefing to whether, under Rule 26(e), Frankenmuth bore a duty to supplement its discovery responses with the affidavit and its exhibits. But under Rule 37(c), even if Frankenmuth breached its duty to supplement, the court need not exclude the affidavit if Frankenmuth's failure was "substantially justified" or "harmless." The court finds that Frankenmuth's non-production is harmless. So the court will address only that issue.

Rule 37(c) provides:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The only case law the parties present and that the court could locate discussing harmlessness under Rule 37(c) addresses unproduced affidavits that the non-disclosing party received *before* the close of discovery. Here, Mr. Goodgame executed the first affidavit on June 11, 2021—ten days *after* the close of discovery on June 1. But that authority is still instructive here.

One court found *harmless* non-disclosure when the plaintiff relied on an affidavit that the plaintiff identified in her privilege log and that was executed by an affiant whom the plaintiff had disclosed as a potential witness. *See McKenzie v. Talladega City Bd. of Edu.*, 242 F. Supp. 3d 1244, 1248 (N.D. Ala. 2017). Even though the plaintiff never produced the affidavit to the defendant, the court found

that the privilege log and disclosure of the witness's identity notified the defendant that the plaintiff may rely on the affiant for testimony. The court found the nondisclosure to be harmless because this notice left the defendant with "ample opportunity to depose [the affiants] within the time allowed by the Court's Scheduling Order." *Id.* at 1249.

On the other hand, one court found non-disclosure to be *harmful* when the defendant relied on unproduced affidavits received before the close of discovery, despite the defendant's previously identifying the affiants as potential witnesses. *Minor v. Central Forest Prods., Inc.*, No. 3:19-cv-1631-CLS, 2021 WL 2637384, *3 (N.D. Ala. Mar. 8, 2021). But key to that court's reasoning was that plaintiff's counsel chose not to interview the affiants because the defendant appeared to have no intent to rely on the affiants for evidentiary support. *Id.* ("While it is true that plaintiff's attorney *could have* interviewed those four witnesses on his own accord, it is disingenuous to say it was 'harmless' to withhold affidavits that might have prompted him to take such a step.") (emphasis in original).

Here, Frankenmuth does not dispute that it failed to produce the affidavit before its summary judgment filings. And the parties do not state whether Frankenmuth ever identified Jason Goodgame as a witness "likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i).

Even so, the court finds that Frankenmuth's non-disclosure was harmless. The only harm that 5 Points identifies is that "5 Points could have interviewed Mr. Goodgame sooner and been able to incorporate his testimony in its motion for summary judgment—rather than responding to the evidence." (Doc 30 at 4). But 5 Points *did* interview Mr. Goodgame, and 5 Points incorporated his testimony in its summary judgment filings. For example, 5 Points relied heavily on the second affidavit in its reply brief for its own motion for summary judgment. (Doc. 26 at 3, 6, *et seq*.). And 5 Points cited the second affidavit in its response to Frankenmuth's motion for summary judgment. (Doc. 23 at 5, 8, 10). Below, the court fully considers the second affidavit alongside the first as it analyzes the summary judgment motions. So the court cannot see how 5 Points' inability to interview Mr. Goodgame "sooner" harmed its (ultimately successful) efforts to incorporate his testimony into its summary judgment filings.

If anything, 5 Points gained an advantage by acquiring an affidavit that directly responded to Frankenmuth's argument. Because Frankenmuth revealed Mr. Goodgame's first affidavit with its summary judgment filings, 5 Points procured a second affidavit that directly responded to Frankenmuth's use of the first affidavit. That order of events makes Frankenmuth's failure to produce the affidavit less harmful than in *Minor* and *McKenzie*, where the party moving to strike did not interview the affiants and thus had no evidence to rebut the

unproduced affidavit. Unlike those cases, 5 Points seized its opportunity to procure additional testimony from Mr. Goodgame. *See McKenzie*, 242 F. Supp. 3d at 1249. And as 5 Points accentuates in its briefs, Mr. Goodgame's second affidavit directly calls into question the statements in his first. (Doc. 26 at 6; doc. 23 at 10).

Further, unlike the non-disclosing parties in *Minor* and *McKenzie*, Frankenmuth did not acquire Mr. Goodgame's affidavit before the close of discovery and continue to conceal it. Frankenmuth's reason for failing to disclose the affidavit is a relevant factor for the harmlessness analysis. *See Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004). As explained above, Frankenmuth acquired the first affidavit ten days after the close of discovery. And Frankenmuth emphasizes that it only discovered Mr. Goodgame's connection to the case in McCormick's deposition on June 1, 2018—the day that discovery closed. Frankenmuth states that non-disclosure was an "inadvertence" in the shuffle to prepare summary judgment filings. (Doc. 28 at 8). Frankenmuth's failing to disclose an affidavit that it received after the close of discovery from an affiant whose connection to the case it discovered the day that discovery closed does not resemble the more flagrant rule violations in cases like *Minor* and *McKenzie*.[2]

---

[2] In no way does the court condone Frankenmuth's delay in this regard. Rather, the court finds Frankenmuth's "inadvertence" unsurprising, given *both* parties' apparent tendency to obtain key discovery at the last minute. For example, the parties deposed two key witnesses on May 27, 2021 and June 1, 2021 (docs. 21-5, 21-11); they required an extension to depose Frankenmuth on

The court also finds that Frankenmuth's non-disclosure of the *documents* attached to the affidavit is harmless. Frankenmuth's summary judgment briefs never rely on the exhibit documents as independent sources of evidence. And as with the affidavit, 5 Points only argues that earlier disclosure would have allowed it to "addres[s] those documents in its own motion for summary judgment." (Doc. 24 at 8). But 5 Points did address these documents in its reply and response briefs. (Doc. 23 at 10, *et seq.*; 26 at 6, *et seq.*). So, the court finds that Frankenmuth's failure to disclose the exhibit documents is also harmless.

The court will DENY 5 Points' motion to strike the affidavits and attached exhibits because 5 Points interviewed Mr. Goodgame in response to that evidence and incorporated Mr. Goodgame's second affidavit in its summary judgment filings. As the court analyzes the parties' cross motions for summary judgment, the court will consider those documents as evidence in the factual record.

## LEGAL STANDARD

Because both Frankenmuth and 5 Points request summary judgment concerning their declaratory judgment claims, the court will set out the standards for reviewing summary judgment, for reviewing declaratory judgments, and for reviewing insurance claims.

---

June 10 (doc. 21-30); and 5 Points obtained two key affidavits after the close of discovery (docs. 23-1, 23-2).

## I.   **Summary Judgment Standard**

Summary judgment allows a trial court to decide cases that present no genuine issues of material fact and in which the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence presented through the prism of the substantive evidentiary burden." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). But the court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id*. at 255. And the court must view all evidence and inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

The parties in this case have filed cross-motions for summary judgment. But the filing of cross-motions for summary judgment does not affect the summary judgment standard. *See, e.g.*, *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984). The Eleventh Circuit has clarified that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Oakley*, 744 F.2d at 1555. Instead, "the court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Ala. Mun. Ins. Co. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (citation omitted).

## II.    Standards for Declaratory Judgments

Under the Declaratory Judgment Act, the court may issue a judgment declaring the parties' rights and legal relations. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (citing 28 U.S.C. § 2201(a)). If parties file for summary judgment concerning declaratory judgment claims, then the court applies the typical summary judgment standard concerning the particular right at issue—that is, whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law concerning the right at issue. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) ("We have long considered 'the operation of the Declaratory Judgment Act' to be only 'procedural,' leaving 'substantive rights unchanged.' . . . And we have held that 'the burden of proof' is a 'substantive aspect of a claim.'") (citations omitted).

## III.   Standards for Insurance Claims

In this diversity action, Alabama law governs the parties' claims. *See O'Neal v. Kennamer*, 958 F.2d 1044, 1046 (11th Cir. 1992) ("A federal court in a diversity case is required to apply the laws . . . of the state in which the federal court sits."). Under Alabama law, the insured bears the burden of proving that a claim is covered under the policy. *State Farm Fire & Cas. Co. v. Shady Grove Baptist Church*, 838 So. 2d 1039, 1043 (Ala. 2002). But when denying a claim as not covered, the insurer bears the burden of proving that a claim is excluded under the

policy. *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 697 (Ala. 2001).

The parties' cross-motions also require the court to interpret the terms of the Policy. Alabama law provides that "a court should give the terms of the contract their clear and plain meaning and should presume that the parties intended to do what the terms of the agreement clearly state." *Brewbaker Motors, Inc. v. Belser*, 776 So. 2d 110, 112 (Ala. 2000). And absent any ambiguity in policy terms, "insurance companies are entitled to have their policy contract enforced as written." *State Farm Fire & Cas. Co.*, 838 So. 2d at 1042–43. Here, 5 Points notes that the Policy fails to define the term "renovation," but 5 Points does not argue that that term is ambiguous. (Doc. 17 at 16 n.2). If a policy fails to define its terms, the court may look to dictionary definitions to construe the ordinary meaning of policy terms. *Carpet Installation & Supp. of Glenco v. Alfa Mut. Ins. Co.*, 628 So. 2d 560, 562 (Ala. 1993).

## ANALYSIS

First, the court will address the parties' cross-motions for summary judgment as to their declaratory judgment claims. Then, the court will address Frankenmuth's motion for summary judgment as to 5 Points' breach of contract claim. Finally, the court will address Frankenmuth's motion to strike the damages report.

## I.    <u>The Declaratory Judgment Claims</u>

Frankenmuth moves for summary judgment as to its declaratory judgment claim because 5 Points' property remained vacant for more than 60 days before the loss at issue. (Doc. 18 at 16). 5 Points moves for summary judgment as to its declaratory judgment claim for the opposite reason; it argues that the building was not vacant during that period. (Doc. 17 at 13).

The parties dispute whether the vacancy exclusion applies on two grounds. First, the parties dispute whether 5 Points' building was under "renovation" within 60 days before the loss. Second, the parties dispute whether 5 Points' lessee—Southeastern Grocers—was using the building "to conduct its customary operations" in the 60 days before the loss. If either of these conditions occurred, the vacancy exclusion does not apply to exclude coverage.

For the reasons stated below, the court finds that Five Points' building underwent "renovations," but the court finds a genuine issue of material fact as to whether those renovations occurred within 60 days before the loss. This genuine dispute exists both when viewing the evidence in the light most favorable to 5 Points for purposes of Frankenmuth's motion, and when viewing the evidence in the light most favorable to Frankenmuth for purposes of 5 Points' motion. So, the court will deny both parties' motions for summary judgment on that grounds. But the court finds that Southeastern Grocers was not using the building to conduct its

customary operations. So, the court will also deny 5 Points' motion for summary judgment on that ground.

### A. *Whether 5 Points' Building was Under Renovation within 60 Days Before the Loss*

As stated above, the policy provides that "buildings under construction or renovation are not considered vacant." (Doc. 19-1 at 73). And the policy states that Frankenmuth is not liable for losses "if the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage." (*Id.*). The parties dispute whether the repairs made to 5 Points' building constitute "renovations" and whether any of those repairs occurred after June 10, 2018, which was 60 days prior to the attempted theft. The court finds that the repairs to 5 Points' building were "renovations" but that a genuine issue exists as to the date that the last renovations occurred.

### i.     Whether the Repairs Constitute "Renovation"

The parties do not dispute any material facts relevant to whether the repairs to 5 Points' building constitute renovations. And even viewing the facts in the light most favorable to Frankenmuth, the court agrees with 5 Points that the repairs constitute renovations.

The parties agree that McCormick Refrigeration removed fixtures including coolers and sprinklers from 5 Points' building, and they agree that this removal required McCormick to create holes in 5 Points' building. The parties also agree

22

that the Goodgame Company and its subcontractors repaired 5 Points' building by replacing the mortar blocks to fill in the holes. But Frankenmuth argues that these repairs were not "renovations" because "McCormick Refrigeration was hired by a third-party, not 5 Points or Southeastern Grocers." (Doc. 25 at 16).

The Policy does not define "renovation," and the court could not locate any Alabama case law addressing the definition of "renovation" as used in insurance policies. But the court may look to dictionary definitions to construe the ordinary meaning of words. *Carpet Installation & Supp. of Glenco*, 628 So. 2d at 562. Here, the court finds no ambiguity in the term "renovation," which has a straightforward dictionary definition: "to restore to a former[,] better state (as by cleaning, repairing, or rebuilding)." *Renovate*, Mirriam-Webster.com Dictionary (last visited Jan. 21, 2022); *see also Renovate*, Oxford English Dictionary (3d ed. 2009) ("work undertaken to restore, repair, or develop a building which is old or in poor condition").

And despite the absence of Alabama authority on the issue, courts interpreting similar insurance provisions have found that renovations "can include something as minor as repairs to walls and insulation." *Wilheit Family Props., L.P. v. Netherlands Ins. Co.*, No. 2:11-cv-300-WCO, 2013 WL 12291715, *5 (N.D. Ga. Jan. 24, 2013). For example, the court in *Wilheit* found that repairs to "torn insulation, damage to doors, and damage to support poles" constituted

"renovations" under the parties' policy. *Id.* at *5 n.2. Another court found that a tenant's removing an exterior covered walkway constituted a renovation because that removal "restore[d] the premises to the condition they were in prior to the construction of the walkway." *The Farbman Group v. Travelers Ins. Co.*, No. 03-74975, 2006 WL 2805646, *5 (E.D. Mich. Sept. 28, 2006).

The court concludes that the work completed at 5 Points' building constitutes a renovation. The before-and-after photographs of the building's extensive damage supports the testimony of McCormick Refrigeration's representative: "You wouldn't want me to leave the hole in the building, and I don't blame him, and we didn't. We put it back just like we was supposed to do." (Doc. 21-11 at 7; 24–25). In other words, replacing the mortar blocks "restored" 5 Points' buildings "to a former[,] better state." *See Renovate*, Mirriam-Webseter.com Dictionary. Further, that work resembles the "renovations" that tenants typically complete to restore their leased premises at the completion of their leases. *See Wilheit Family Props.*, 2013 WL 12291715, at *5; *The Farbman Group*, 2006 WL 2805646, at *5.

Frankenmuth provides no authority for its argument that the entity engaging in the renovations must be the landlord or tenant. The policy only states, "buildings under construction or renovation are not considered vacant." (Doc. 19-1 at 73). This language presents no requirement as to who must do the renovating. At least

one other court has rejected Frankenmuth's argument. *See The Farbman Group*, 2006 WL 2805646, at *9. In that case, the court noted that "[n]othing in the Policy required that *[the insured] itself* be directly engaged or involved in the process of construction or renovation." *Id.* (emphasis in original). In the absence of policy language requiring 5 Points to play a role in the renovations, the court finds no merit to Frankenmuth's argument.

Based on undisputed facts, the court finds that the mortar repairs to 5 Points' building constituted "renovations" under the policy. So if those renovations occurred within 60 days before the date of 5 Points' alleged loss, the vacancy exclusion does not apply

### ii.    Whether the Renovations Occurred within 60 Days Before the Loss

Five Points suffered its alleged loss on August 9, 2018. So the vacancy exclusion applies to 5 Points' claims unless the renovations to 5 Points' building occurred on or after June 10, 2018—that is, within sixty days prior to the alleged loss.

The parties agree that McCormick Refrigeration removed fixtures including coolers and compressors. The parties also agree that McCormick hired Goodgame construction company to repair the holes in the walls that McCormick created to remove the *coolers* from the building's lower level, and that these repairs occurred before June 10, 2018. But the parties dispute who repaired the hole that

25

McCormick created when it removed *compressors* from an upper portion of 5 Points' building. And they also dispute the date that the compressor hole was repaired.

Frankenmuth argues that (1) Goodgame or its subcontractors performed all mortar repairs to 5 Points' building, including repairs to the compressor hole; and that (2) Goodgame and its subcontractors completed all those repairs on or before May 14, 2018. But 5 Points argues that (1) an entity other than Goodgame[3] performed mortar repairs to the compressor hole and that (2) the compressor hole was repaired on June 30, 2018.

Because of these factual disputes, the court will address this issue under the factual presumptions appropriate to each party's motion.

### (a) Frankenmuth's Motion

As support for its argument that Goodgame performed the repairs on or before May 14, Frankenmuth relies on Mr. Goodgame's first affidavit.

As discussed, Larry McCormick testified that he hired Goodgame Company to perform the mortar repairs to 5 Points' building. (Doc. 21-11 at 7). But McCormick could not recall the dates or months that his company worked at 5 Points' building (*Id.* at 5). Mr. Goodgame's first affidavit provides an alleged date for those repairs. Mr. Goodgame swore:

---

[3] 5 Points does not identify who allegedly completed the repairs.

Goodgame Company, Inc. was retained by Larry McCormick with McCormick Refrigeration to install blocks where there was a hole in the wall after a cooler(s) had been removed from a building. . . .

The coolers had been removed prior to May 14, 2018, because on May 14, 2018, M&B Masonry, who had been retained by Goodgame Company, Inc., replaced all of the damaged and/or missing blocks at the Winn-Dixie location at 2200 Bessemer Highway, Ensley, Alabama 35010. All of the block work was completed on May 14, 2018. . .

Goodgame Company, Inc. had completed all of its work at the Winn-Dixie location located at 2200 Bessemer Highway, Ensley, Alabama 350101 by May 14, 2018.

(Doc. 18-7 at 2–3).

But 5 Points responded with the sworn testimony of Marialana Watkins, 5 Points' representative. (Doc. 21-12). Watkins testified that on June 30, 2018, she saw workers "knock a big hole in the back and t[ake] out some kind of refrigeration." (Doc. 21-12 at 17). She testified that a McCormick employee who was on site assured her that he would repair the hole. (Doc. 21-12 at 18). And she testified that she personally observed them repair the hole on "the same day." (*Id.*).

For purposes of Frankenmuth's motion, the court finds a genuine dispute as to the date of 5 Points' building renovations. On the one hand, Mr. Goodgame's first affidavit states that his company and subcontractors completed all mortar repair work as of May 14, 2018. But as 5 Points notes, Mr. Goodgame's affidavit speaks only about repairs to the "cooler" holes. *See* (Doc. 18-7 at 2–3). He does not address when repairs were completed to the compressor hole, which was on the

27

second level. So, viewing this evidence in the light most favorable to 5 Points, Mr. Goodgame's affidavit does not show that *all* mortar repairs were completed as of May 14, 2018.

Further, Ms. Watkins repeatedly testified that she observed workers removing refrigeration items and repairing holes in 5 Points' building on June 30, 2018. So, even if Mr. Goodgame's affidavit provided evidence of a May 14 completion date, that evidence directly conflicts with Ms. Watkins's testimony.

The court may not make a credibility determination regarding conflicting evidence because it "presents a classic swearing match, which is the stuff of which jury trials are made." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). So the court finds that Ms. Watkins's testimony creates a genuine dispute as to whether 5 Points' building was under renovation as late as June 30, 2018, as she testified.

Frankenmuth argues that the court should disregard Ms. Watkins's testimony because it is "self-serving." (Doc. 27 at 2 n.1). But the Eleventh Circuit has stated,

> A plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.

*Feliciano*, 707 F.3d at 1253. Ms. Watkins offered her EUO testimony as 5 Points' official representative; so the analysis of *Feliciano* applies to her statements on behalf of 5 Points. *See* (doc 21-12 at 2). And "blatant contradictions" require strong evidentiary support contrary to the self-serving assertion, such as videotape evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Frankenmuth has identified no such evidence here.

Further, the Circuit Court in *Feliciano* stated that courts may rely on self-serving statements when they contain "non-conclusory descriptions of specific, discrete facts of the who, what, when, and where variety." *Feliciano*, 707 F.3d at 1253. Here, Ms. Watkins testified in non-conclusory fashion as to *what* the renovation work included, *when* the renovations occurred, and *where* they occurred. So the court cannot disregard Ms. Watkins's statements.

Viewing the evidence in the light most favorable to 5 Points, the court finds a genuine dispute as to whether renovations to 5 Points' building occurred as late as June 30, 2018, which would mean the building was not vacant within 60 days before the alleged loss. So the court will DENY Frankenmuth's motion for summary judgment as to its declaratory judgment claim.

### (b) 5 Points' Motion

As stated before, 5 Points admits that Goodgame repaired the cooler holes in its building around May 2018. But 5 Points argues that Frankenmuth "conflates the

removal of the coolers with the removal of the compressors." (Doc. 26 at 5). Five Points argues that the compressor holes in the upper portion of its building were repaired in a separate job that occurred on June 30, 2018. Viewing the evidence in the light most favorable to Frankenmuth, the court again finds a genuine dispute as to the date of the compressor hole repairs.

As explained, Ms. Watkins testified that she observed workers repairing the building on June 30. And the Goodgame-McCormick invoice is dated July 1, 2018. This testimony supports 5 Points' argument.

But Mr. McCormick clearly testified that he hired Goodgame Company and its subcontractors to repairs *all* mortar holes in 5 Points' building. At his deposition, Mr. McCormick explained the differences between picture exhibits of the three holes in 5 Points' building; examining the photos, he described that he created the two holes on the lower level to remove coolers and the hole on the upper level to remove compressors. (Doc. 21-11 at 10). Mr. McCormick repeatedly assured deposing counsel that his company hired Goodgame Company to perform *all mortar work* at 5 Points' building. (*Id.* at 7, 10). And when specifically asked whether Goodgame repaired the upper-level hole for the compressors, McCormick responded, "yes, sir, sure did." (*Id.* at 7). And McCormick testified that Goodgame conducted all mortar repairs in the same day or two—rather than in separate jobs occurring over a month apart, as 5 Points argues. So although Frankenmuth's

30

argument may "conflate" the cooler repair job with the compressor repair job, McCormick's testimony does not.

The genuine dispute, then, rests on Mr. Goodgame's first affidavit, which states that his company and its subcontractors completed all repairs on or before May 14, 2018. (Doc. 19-7 at 3). As noted in the previous section, Goodgame's first affidavit speaks only about repairs to "cooler" holes. *See* (Doc. 18-7 at 2–3). Arguably, then, Goodgame played no role in repairing the compressor hole on June 30, as Ms. Watkins testified. But nothing indicates that Mr. Goodgame—owner of a construction company—recognized the distinction between compressors and coolers like Mr. McCormick—owner of a refrigeration company. Only McCormick's deposition testimony clearly distinguished between the cooler and compressor holes, and he testified that Goodgame repaired all the holes including those for the compressors. The court must view Goodgame and McCormick's testimony in the light most favorable to Frankenmuth; in that light, the court finds evidence from which a jury could reasonably find that Goodgame completed all mortar repairs—including those to the compressor holes—as of May 14.

But Five Points also rebuts Jason Goodgame's first affidavit with his second. In that affidavit, Mr. Goodgame states merely that he had "no recollection" of repairing the compressor hole, (Doc. 23-1 at 2). But he did not flatly deny performing the repairs to the compressor hole. Certainly, the second affidavit

brings into question the credibility of the first, but the court may not weigh credibility at this stage. *See Feliciano*, 707 F.3d at 1253. Viewing the two affidavits in the light most favorable to Frankenmuth, a jury could reasonably find the second affidavit does not negate Mr. Goodgame's prior testimony that his company and subcontractors completed all work by May 14.

Goodgame's testimony regarding the May 14 completion date, combined with McCormick's testimony that Goodgame repaired all the holes in 5 Points' building, genuinely disputes Ms. Watkins's testimony regarding the June 30 repairs. So the court will also deny 5 Points' motion for summary judgment as to the declaratory judgment claim on this ground.

### B.  *Whether SEG and Winn-Dixie were Conducting their Customary Operations*

Five Points alternatively argues that the vacancy exclusion does not apply because 5 Points leased its building to a lessee who used the space "to conduct its customary operations" within 60 days before the alleged loss. (Doc. 19-1 at 73). But the court finds that neither Winn-Dixie nor Southeastern Grocers—Winn-Dixie's parent company—were conducting their "customary operations" within 60 days before the alleged loss.

Because the policy does not define "customary operations," the court looks again to dictionary definitions. *See Carpet Installation & Supp. of Glenco*, 628 So. 2d at 562. "Customary" means "commonly practiced, used, or observed."

*Customary*, Merriam-Webster.com Dictionary. And an "operation" is the "performance of a practical work." *Operation*, Merriam-Webster.com Dictionary. Putting these definitions together, the question is whether Winn-Dixie was "performing its commonly practiced work" at any point after June 10, 2018 at 5 Points' building.

Other courts interpreting this term have found that "customary operations" are "those for which [the lessee] leased the Property and used it on a regular basis." *See Wilheit Family Props., L.P. C. Netherlands Ins. Co.*, No. 2:11-cv-300-WCO, 2013 WL 12291715, *4 (N.D. Ga. Jan. 24, 2013) (applying Georgia law). Courts also look to whether the lessee continued to conduct "the business pursuit identified by the policy." *Saiz v. Charter Oak Fire Ins. Co.*, 299 F. App'x 836, 840 (10th Cir. 2008). So a lessee whose typical business was a family-style restaurant was not conducting "customary operations" when the lessee's owner closed the restaurant and used the space as an office while trying to find a sublessee. *Id.*; *see also Wilheit Family Props.*, 2013 WL 12291715, at *4 (finding that lessee's performing "minor maintenance and repair" to the property was not customary operation). Nor is "simply retaining a key to the Property" a customary operation. *Wilheit Family Props.*, 2013 WL 12291715, at *4.

Under the Policy, the court must examine whether the "lessee," Winn-Dixie, was conducting its customary operations. (Doc. 19-1 at 73). Winn-Dixie leased its

space to operate a grocery store. And 5 Points concedes that on April 16, 2018, Winn-Dixie stopped selling groceries to the public from 5 Points' building. (Doc. 17 at 5). So the court finds that Winn-Dixie was not conducting its customary operations at 5 Points' building after April 16, 2018.

But 5 Points argues that the court should look to the customary operations of SEG—Winn-Dixie's parent company—rather than Winn-Dixie. Five Points attempts to connect several links in an argument chain: (1) *SEG* was 5 Points' lessee because SEG's storage of fixtures sold to Buy-Lo made it a "holdover tenant" under the lease agreement; (2) SEG's sale and storage of fixtures to Buy-Lo constituted "customary operations" under SEG's bankruptcy restructuring; and (3) SEG's sale and storage extended beyond June 10, 2018. (Doc. 17 at 18, *et seq*.). The court rejects the third argument; so it need not address the first two.

Even accepting that the court should examine SEG's "customary operations" and that selling Winn-Dixie's fixtures was a customary operation of SEG, the court finds a genuine dispute as to whether those operations actually concluded on April 30, 2018, negating 5 Points' argument. In his deposition, SEG's representative agreed that part of SEG's "ongoing business" during the bankruptcy included selling off the assets of Winn-Dixie locations that were closing. (Doc. 21-5 at 8). But the representative testified that SEG managed those sales only "until such time

we sold the equipment." (Doc. 21-5 at 9). He testified that "once that [sale] agreement was in place, it was up to [the buyer] to get it out." (Doc. 21-5 at 10).

Here, SEG executed its Sale Agreement with Buy-Lo on March 23, 2018. (Doc. 21-9 at 2). And the Agreement stated that Buy-Lo "intends to remove the [fixtures] from the Property." (*Id.*). Also, the Bill of Sale for the fixtures transferred title of the fixtures to Buy-Lo, "effective as of April 30, 2018." (Doc. 21-10 at 2). And the letter in which SEG rejects the lease agreement with 5 Points states that SEG "abandon[ed] any personal property to you that may be remaining on the leased premises after April 30, 2018." (Doc. 21-8 at 2).

These documents support the testimony of SEG's representative that his company played no role in the transfer or removal of the fixtures after the point of sale. Here, SEG sold the fixtures to Buy-Lo on March 23 and transferred title effective April 30. If any doubt remained, SEG's lease rejection letter explicitly states that it abandoned any goods remaining at 5 Points' building after April 30. So, viewing this evidence in the light most favorable to Frankenmuth, the court finds—at most—a genuine dispute as to whether SEG conducted its sale operations from 5 Points' building after April 30, 2018.

But 5 Points argues that SEG's "customary operations" went beyond the point of sale and extended to "managing the *third-party removal*" of Winn-Dixie's fixtures. (Doc. 17 at 22) (emphasis added). For example, 5 Points argues that "the

Winn-Dixie manager provided Buy-Lo with a key to the building." (Doc. 17 at 21).

Five Points relies on McCormick's deposition, which is far from clear on this

point:

> I was with Naseem and Mr. Marine [(Buy-Lo's representatives)] and
> the Winn-Dixie manager. Then when Naseem got keys, he g[a]ve me
> the keys to the store, and we started work on it.

(Doc. 21-11 at 5).

For one thing, this testimony does not clarify who gave Naseem the keys to

5 Points' building so that McCormick could remove the fixtures; it says merely

that Naseem "got keys." And even if it did establish that Winn-Dixie's manager

gave keys to Buy-Lo's representative, that testimony would directly contradict that

of SEG's representative. SEG stated that it required Buy-Lo to work "with the

landlord after April 30th" to access 5 Points' building because SEG "sent the keys

and the lock box code to the landlord" around April 30. (Doc. 21-5 at 12). And of

course, SEG's maintaining a key to the property, standing alone, does not

constitute a customary operation. *See Wilheith Family Props.*, 2013 WL 12291715,

at *4.

Further, McCormick could not testify as to when this event occurred. As

stated above, when viewing the evidence in the light most favorable to

Frankenmuth, a genuine dispute exists as to whether McCormick and his

subcontractors completed all their work at 5 Points' building no later than May 14.

36

So even if SEG's providing keys to Buy-Lo could constitute a customary operation, a genuine dispute exists as to whether SEG turned over the keys after April 30, 2018.

Five Points also argues that SEG's storage of the fixtures after sale was a customary operation because Alabama's Article 2 provision for the sale of goods required SEG to do so. (Doc. 17 at 21). Five Points provides no authority for the view that complying with Article 2's requirements constitutes a "customary operation." Even so, Article 2 requires the seller to "put and hold" the goods *only* "for the period reasonably necessary to enable the buyer to take possession." Ala. Code § 7-2-503. Here, McCormick testified that it took three to four weeks to remove the fixtures. (Doc. 21-11 at 8). So, the "reasonably necessary" period for removal was three to four weeks after title transferred on April 30, 2018—i.e., roughly May 28, 2018. Even if Article 2's duty to store the fixtures could determine SEG's customary operations, SEG only bore that duty until May 28, 2018; that date falls outside the 60-day window that the Policy's vacancy exclusion requires.

In short, even granting that (1) the court should examine SEG's customary operations and that (2) selling Winn-Dixie's fixtures was a customary operation of SEG, the court finds a genuine dispute as to whether SEG concluded its sale

37

operations before June 10, 2018. The court will DENY 5 Points' motion for summary judgment on this ground also.

## II.    <u>5 Points' Breach of Contract Claim</u>

To prove a breach of insurance contract, the plaintiff must show "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *State Farm Fire & Cas. Ins. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999).

Frankenmuth moves for summary judgment as to 5 Points' breach of contract claim, arguing that 5 Points cannot present proof of the amount of damages for that claim. (Doc. 18 at 24). As support, Frankenmuth notes that 5 Points failed to disclose an expert witness to testify to the costs for repairing the wiring and electronic items damaged in the attempted theft at its building. (Doc. 18 at 25).

Five Points does not dispute that it failed to disclose a damages expert. (Doc. 23 at 11). And 5 Points has not actually conducted the repairs to its electronic items; so it has no invoices detailing that expense. But 5 Points argues that it only bears the burden of proving *the existence* of damages at this juncture, rather than the specific amount of damages. The court agrees with this legal proposition, but

with an important caveat discussed below. The court will address this argument first.

Alternatively, 5 Points argues that it will be able to prove the amount of damages at trial. The court disagrees again, and it will address this argument second.

And finally, 5 Points argues that, even if it fails to prove the amount of compensatory damages, Alabama law entitles it to nominal damages on the breach of contract claim. The court disagrees; so it will enter summary judgment in Frankenmuth's favor as to 5 Points' breach of contract claim.

### A. Whether 5 Points Must Prove the Amount of Damages at the Summary Judgment Stage

Five Points first argues that its breach of contract claim withstands summary judgment because "whether a party suffers damages is not the same as the calculation of those damages." (Doc. 23 at 11–12). Five Points argues that its burden at this stage is merely to prove that it suffered damages. The court agrees, but 5 Points must still show at this stage that it will be able to offer some admissible evidence as to the amount of damages at trial.

In the insurance context, the Alabama Supreme Court has stated that, at trial, "the plaintiff has the burden of offering evidence tending to show[,] to the required degree, the amount of damages allegedly suffered." *Johnson v. Harrison*, 404 So. 2d 337, 340 (Ala. 1981). At trial, an insured cannot merely present evidence that

he "suffered a loss to his business"; he must provide "evidence as to the amount of such damage." *Id.*; *see also Nat. Sec. Fire & Cas. Co. v. Minchew*, 372 So. 2d 324, 326 (Ala. Civ. App. 1978) ("[T]he insurer's denial of liability, regardless of the grounds, carries with it the condition that the insured must prove the extent of his loss.").

Although the cases cited above concern the insured's burden of proving damages *at trial*, 5 Points wrongly minimizes the importance of that burden at the summary judgment stage. A party may move for summary judgment merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In other words, the moving party may merely indicate that, as to a material fact, the nonmoving party "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Such a challenge shifts the burden to the non-movant to show that it will be able to produce admissible evidence at trial concerning those facts "essential to that party's case, and *on which that party will bear the burden of proof at trial*." *Celotex Corp.*, 477 U.S. at 322 (emphasis added); *see also Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("Evidence inadmissible at trial cannot be used to avoid summary judgment."). Indeed, summary judgment exists so that parties may "demonstrate in the manner

provided by the Rule, *prior to trial*, that the claims and defenses have no factual basis." *Id.* at 327 (emphasis added).

Under Alabama law, 5 Points will bear the burden of proving damages at trial. Permitting 5 Points to advance past the summary judgment stage without showing a genuine issue of material fact as to its damages would allow 5 Points to proceed to trial with a breach of contract claim that may have "no factual basis." *Celotex Corp.*, 477 U.S. at 327. The court's summary judgment analysis turns on whether 5 Points can demonstrate a genuine issue of material fact with admissible evidence as to every element of its case—including the amount of damages. *See Celotext Corp.*, 477 U.S. at 325; *Corwin*, 475 F.3d at 1249. So at this stage, 5 Points must rebut Frankenmuth's argument that 5 Points lacks evidence that will be admissible at trial to prove the amount of damages. The court will address 5 Points' proposed evidence now.

### B. Evidence of Damages and Frankenmuth's Motion to Strike

Five Points offers three categories of evidence supporting its damages claim: (1) an affidavit by Marialana Watkins, part of which Frankenmuth moves to strike; (2) Watkins's testimony in her Examination Under Oath; and (3) Frankenmuth's alleged admissions of 5 Points' damages. The court will address each category of evidence below.

### i.     Frankenmuth's Motion to Strike a Portion of Marialana Watkins's Affidavit

Five Points supported its summary judgment briefs with an affidavit by 5 Points' corporate representative, Marialana Watkins. (Doc. 23-2). She swore that she "solicited an estimate from BDI, Inc. to repair the building" and that BDI estimated a cost of $296,600 for the repairs. (Doc. 23-2 at 3). Five Points attached BDI's repair estimate as an exhibit to the affidavit. (Doc. 23-2 at 8).

Frankenmuth now moves to strike the testimony of Marialana Watkins as to the amount of 5 Points' damages and BDI's repair estimate because 5 Points did not timely disclose any expert witness to testify to damages. (Doc. 29). In response to Frankenmuth's motion to strike, 5 Points *voluntarily withdrew* both the estimate and the paragraph in Watkins's affidavit about procuring the estimate. (Doc. 31 at 2). So, the court will not rely on that estimate or the testimony of Watkins in the withdrawn paragraph of the affidavit as it rules on this issue. And the court will find Frankenmuth's motion to strike MOOT because 5 Points withdrew the challenged evidence.

Frankenmuth did not challenge the preceding paragraph of Ms. Watkins's affidavit, in which she swore that 5 Points' building "suffered damage" when individuals broke into the building and "stripped and cut copper electrical wire from the conduit that it was in, and they damaged numerous electrical panels and

light fixtures." (Doc. 23-2 at 2–3). This paragraph does not assert the cost of repairs. The court will consider this paragraph as evidence that damage occurred.

### ii.   Marialana Watkins's Examination Under Oath Testimony and Exhibits

Next, 5 Points seeks to prove its damages with Ms. Watkins's testimony and exhibits from a March 2020 Examination Under Oath conducted by Frankenmuth. (Doc. 21-12). At the EUO, Ms. Watkins discussed the damages that 5 Points was seeking in the insurance claim. She agreed that, instead of providing an itemized list of damages in the "Contents Evaluation Form," she was "going to rely solely upon the estimate that was prepared by BDI, Inc." (*Id.* at 23). Based on that estimate, she testified that 5 Points sought $296,600 to repair the items allegedly damaged in the attempted theft. She also made clear that she played no role in BDI's calculating the replacement cost estimate, that she did not attempt to calculate the actual cash value of 5 Points' losses, and that she did not clarify with BDI whether its estimate reflected items damaged in the removal of the coolers in addition to items damaged by the attempted theft. (*Id.*).

At the EUO, Ms. Watkins presented the Contents Evaluation Form as an exhibit. As Watkins testified, the Form contains only a handwritten statement: "I am relying solely on the attached estimate." (Doc. 21-22 at 21). Attached to the Evaluation Form is BDI's repair estimate; it is the same estimate that 5 Points later attached to Watkins's summary judgment affidavit. (Doc. 21-22 at 21). The

43

estimate lists allegedly damaged items such as electrical panels and conduits, but it does not provide itemized cost estimates. Instead, it concludes that the total cost of the repair work will be $296,600. (*Id.* at 24).

A party cannot rely on inadmissible evidence to create a genuine issue of material fact at the summary judgment stage. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("Evidence inadmissible at trial cannot be used to avoid summary judgment."). Here, the court finds the BDI repair estimate inadmissible for two reasons.

First, "it is well-settled that expert evidence is generally necessary to establish the cause and scope of damage." *Porben v. Atain Specialty Ins. Co.*, 546 F. Supp. 3d 1325, 1330 (S.D. Fla. 2021); *see also State Farm Fire & Cas. Co. v. Williams*, 926 So. 2d 1008, 1017 (Ala. 2005) (finding that insured failed to prove breach of contract claim when only evidence of repair costs was insured's testimony based on estimate). Courts routinely find that repair estimates constitute expert testimony because producing the estimate requires the witness to "forecast the amount, type, and costs of materials needed, as well as the amount of labor required to complete the long list of repairs." *Pendarvis v. Am. Bankers Ins. Co. of Fla.*, 354 F. App'x 866, 869 (5th Cir. 2009) (interpreting Fed. R. Evid. 702 concerning expert testimony); *see also*; *Ivy Marine Consulting, LLC v. Monarch*

*Energy Partners, Inc.*, No. 17-0563-WS-N, 2019 WL 1173356, *2 n.4 (S.D. Ala. Mar. 13, 2019) (collecting similar cases).

Accordingly, Frankenmuth argues that the court should not consider the estimate because 5 Points did not disclose an expert witness. The court agrees. BDI's estimate constitutes expert testimony, and 5 Points did not disclose an expert. Because the estimate was not part of a disclosed expert's report, it cannot create a genuine issue of material fact as to the amount of damages at this stage. *See* Fed. R. Civ. P. 37(c) (providing that party may not rely on evidence that it failed to disclose).

And second, the Eleventh Circuit has stated that unsupported repair estimates constitute hearsay. *See Matthews v. State Farm Fire & Cas. Co.*, 500 F. App'x 836, 841 (11th Cir. 2012) ("As for the [insured's damages] estimate, the only evidence in the record is the written estimate itself. [The declarant] did not appear for his deposition and Plaintiffs have submitted no affidavit from [him]. Without more, the written estimate is inadmissible hearsay."); *Porben v. Atain Specialty Ins. Co.*, 546 F. Supp. 3d 1325, 1331 (S.D. Fla. 2021) (finding that an "unauthenticated, unsigned, and unsupported estimate of damages" constituted hearsay); *Williams*, 926 So. 2d at 1017 (finding that plaintiff's testimony about repair costs to his own home based solely on repair estimate constituted hearsay) (interpreting Alabama Rules of Evidence). If 5 Points had provided testimony or an

affidavit from BDI to support the estimate, and if 5 Points had disclosed BDI as a damages expert, BDI's estimate would likely be admissible at trial. But 5 Points failed to do either of those things; so BDI's estimate is inadmissible hearsay. Because it is hearsay and cannot be reduced to admissible evidence due to 5 Points' failure to disclose a damages expert, the estimate does not create a genuine issue of material fact as to damages.

Five Points also argues that, at trial, Ms. Watkins may offer *lay* testimony concerning repair costs based on her "first-hand experience of contracting for their repair." (Doc. 23 at 13) (citing *Dunn v. Allstate Ins. Co.*, No. 2:04-cv-205-RWS, 2008 WL 11407404, *6 (N.D. Ga. Jan. 22, 2008)). The court disagrees for the same reasons identified above.

For example, the court has already found that repair estimates constitute expert—rather than lay—testimony because they require the witness to apply specialized knowledge to assess the cost of damaged items and labor. At her EUO, Watkins admitted that she played no role in assessing the repair costs herself. (Doc. 23-12 at 23). She did not produce a list of allegedly damaged items, did not calculate repair costs or actual costs, and did not follow up with BDI about the accuracy of its estimate. Rather, her understanding of 5 Points' damages "rel[ied] solely upon the estimate that was prepared by BDI, Inc." (*Id.*). In other words, her testimony concerning the repair costs would consist of nothing more than reading

the figures produced by BDI. But the provision for expert testimony under the Federal Rules of Evidence prevents parties from admitting "expert testimony under the guise of lay opinion." *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005). Watkins's testimony, which relies solely on BDI's estimate, would do just that.

Further, Watkins's recitation of BDI's repair estimate would constitute inadmissible hearsay. As explained above, unauthenticated repair estimates are hearsay. *See Matthews*, 500 F. App'x at 841. Watkins could not testify as to how BDI arrived at its cost estimate. Rather, she would merely recite BDI's findings for the truth of the matter asserted—that is, the cost of repairs. That makes Watkins's repair cost testimony inadmissible hearsay. *See United States v. Santos*, 947 F.3d 711, 723 (11th Cir. 2020) ("Hearsay is a statement, other than one made by a declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted.") (citation omitted).

Even so, 5 Points argues that Ms. Watkins can offer lay testimony regarding repair costs based on a single sentence in *Dunn v. Allstate Insurance Company*, 2008 WL 11407404, *6. In that case, the insured attempted to offer lay testimony about the cost to repair a building and canopy structure. The insured argued that he was competent to give that lay testimony based on his "experience in acting as a general contractor in the building of three [other] structures." *Id.* The court found

that the insured's testimony was expert, rather than lay, testimony. *Id.* As here, the court refused to permit that testimony because the plaintiff had declared no expert witness as to damages. But the court also noted that the insured could not provide *lay* testimony to repair costs of his damaged buildings because he "avoided the first-hand experience of contracting for their repair[, which] demonstrates that he had no opportunity to develop a *first-hand perception* of the cost to repair those structures." *Id.* Five Points argues that this sentence "indicates that a plaintiff who has 'first-hand experience of contracting for their repair' can likely testify" as to repair costs. (Doc. 23 at 13).

*Dunn* does not win the day for 5 Points. The court in *Dunn* found that the insured's testimony was *expert* testimony because it relied on his experience as a builder and contractor. Because the court in *Dunn* reached this conclusion, it never discussed how a witness's "first-hand experience of contracting" gives rise to admissible *lay* testimony about the cost of repairs. But as stated above, this court finds that repair estimates constitute expert testimony, and unauthenticated repair estimates constitute hearsay. *Dunn*'s reasoning does not indicate how Watkins's repair cost testimony, which merely recites BDI's estimate, would overcome those deficiencies. Permitting a lay witness to testify to expert conclusions anytime that they "contract for" those conclusions would vitiate the expert disclosure and qualification requirements. The court will not allow 5 Points to shoehorn in BDI's

expert testimony through Watkins's so-called lay testimony. So, the court finds that neither Ms. Watkins's EUO testimony nor the BDI repair estimate presented as an exhibit at the EUO constitute admissible evidence that creates a genuine dispute as to the amount of 5 Points' damages.

### iii.    Frankenmuth's Alleged Admissions of 5 Points' Damages

Finally, 5 Points argues that Frankenmuth has admitted that 5 Points suffered damages. For example, 5 Points directs the court to Frankenmuth's brief, Frankenmuth's claim rejection letter, and the deposition transcript for Frankenmuth's adjuster. Each of these documents states generally that a "loss occurred" (doc. 21-28 at 4), that "the loss at issue was . . . caused by a theft or attempted theft" (doc. 18 at 14), or that a "loss took place" (doc. 21-30 at 8).

The court will consider these statements, but below it will explain why they do not create a genuine issue as to 5 Points' damages.

### C.  Whether 5 Points' Admissible Proof Sufficiently Proves the Amount of its Damages

To summarize the above findings, 5 Points' admissible evidence concerning damages includes (1) statements in Marialana Watkins's affidavit concerning the damage to the wires and electrical components in 5 Points' building and (2) Frankenmuth's several statements describing 5 Points' "loss." The court finds that

this evidence does not create a genuine issue of fact by showing proof that will be admissible at trial concerning the amount of 5 Points' damages.

As an initial matter, the court does not take Frankenmuth's occasional use of the term "loss" to be an admission that 5 Points has sufficiently proven a covered loss under the policy. The rigor with which Frankenmuth litigates its current claims shows as much.

More importantly, Frankenmuth's alleged "admissions" indicate—at most— that 5 Points suffered *some* amount of damages in the attempted theft. But as explained above, the insured may not carry his burden at trial with conclusory statements that he "suffered a loss." *Johnson*, 404 So. 2d at 340. Frankenmuth's statements do not concede that 5 Points has shown a genuine issue of material fact as to the *amount* of damages. So, they do not help 5 Points' case.

The admissible statements in Ms. Watkins's affidavit fare no better. Watkins's statements indicate that 5 Points "suffered damage" when the attempted theft harmed 5 Points' wires and electrical panels, but it does not state the amount of those damages. (Doc. 23-2 at 2–3). Again, these statements show only that 5 Points suffered *some* damage—not the amount of those damages. Watkins's general statements that items were damaged would perhaps create a genuine issue of fact *if* 5 Points also showed that it could offer some admissible evidence concerning the amount of damages at trial. But as explained above, 5 Points has

failed to do so. So, Watkins's statements do not create a genuine issue of material fact as to the amount of damages at this stage.

Rather, Watkins's testimony resembles that offered in *National Security Fire & Casualty Co. v. Minchew*, in which the insured testified at trial that her clothes and possessions "burned up" in a house fire but offered no valuation of those items. *See* 372 So. 2d 324, 326 (Ala. Civ. App. 1978). The Alabama Court of Civil Appeals found that, "[w]hile this is clearly competent evidence to establish the fact of the loss of the contents of the home, it is not sufficient evidence to sustain proof as to the amount of such loss." *Id.* Likewise here, Ms. Watkins's testimony merely identifying damaged items will not sufficiently prove the amount of 5 Points' losses at trial. So, that testimony does not carry 5 Points' burden to create a genuine issue of material fact as to damages at this stage.

### D. Five Points' Claim for Nominal Damages

In a last-ditch effort, 5 Points argues that, even if it fails to meet its burden to prove the amount of compensatory damages, its breach of contract claim survives because 5 Points may seek nominal damages for that claim. The court disagrees.

Alabama law provides for "nominal damages if a breach of contract is proven, even if a breach-of-contract plaintiff cannot prove actual damages." *Brooks v. Franklin Primary Health Cntr., Inc.*, 71 So. 3d 695, 698 (Ala. Civ. App. 2011) (quoting *Knox Kershaw, Inc. v. Kershaw*, 552 So. 2d 126, 128 (Ala. 1989)).

Much precedent supports the nominal damages rule in non-insurance contract cases. *See Knox Kershaw, Inc.*, 552 So. 2d at 128 (finding nominal damages available for breach of noncompete agreement); *Brooks*, 71 So. 3d at 698 (same, for breach of employment contract).

But 5 Points does not cite, and this court could not locate, any authority supporting an award of nominal damages in cases concerning a breach of *insurance* contract. Rather, Alabama courts have held that "the language of the insurance policy determines the measure of damages to be recovered." *Pritchett v. State Farm Mut. Auto Ins. Co.*, 834 So. 2d 785, 789 (Ala. Civ. App. 2002); *see also Reliance Ins. Co. v. Substation Products Corp.*, 404 So. 2d 598, 609 (Ala. 1981) (limiting recovery to "the correct measure of damages under the policies"). The court has concluded that 5 Points fails to provide admissible evidence creating a genuine issue of fact as to the amount of damages under the "language of the insurance policy"; so the court cannot discern how 5 Points could recover nominal damages for which the policy does not provide.

The court has located at least one case in which the Alabama Supreme Court ruled that an insured may not prevail on a breach insurance contract claim if the insured fails to prove the amount of covered losses. In *State Farm v. Williams*, the Alabama Supreme Court found that the insured's breach of contract claim failed as a matter of law because the insured's only evidence concerning repair costs to his

home consisted of his testimony, which was "based solely on what [a construction repair company] had told him and that he did not possess the expertise to estimate the cost to repair his damaged property." 926 So. 2d at 1016. The parties did not raise the issue of nominal damages. But the Supreme Court found that the trial court should have granted the insurer's motion for judgment as a matter of law because the insured "failed to present substantial evidence of an essential element of their breach-of-contract claim—damages." *Id.* at 1018.

The evidence that 5 Points plans to offer at trial—Ms. Watkins's lay testimony based solely on BDI's estimate—is nearly identical to the evidence that the Supreme Court rejected in *Williams*. And the holding of *Williams* accords with the general view in breach of insurance contract cases that "the party claiming damages has the burden of establishing the existence of and amount of those damages by competent evidence. The award of damages cannot be made upon speculation." *Johnson*, 404 So. 2d at 340 (finding that insured could not recover damages when insured offered "no evidence as to the amount of such damage"); *see also Minchew*, 372 So. 2d at 326 ("The insurer's denial of liability, regardless of the grounds, carries with it the condition that the insured must prove the extent of his loss.").

Based on this authority, the court finds that 5 Points' breach of contract claim may not survive summary judgment based on the possibility of nominal

damages for that claim. As explained above, 5 Points only creates a genuine issue of fact as to the amount of damages if it shows that it will be able to present some admissible evidence at trial as to that amount. Because 5 Points has failed to show that it will be able to present any admissible evidence as to the amount of damages, 5 Points cannot prove "an essential element of [its] breach-of-contract claim—damages." *See Williams*, 926 So. 2d at 1018. Five Points may not rely on nominal damages to carry its breach of contract claim.

In sum, because 5 Points bears the burden of proof as to the amount of damages at trial, it must show at this stage that it can offer some admissible evidence as to that element. Five Points' only evidence shows that a loss occurred—not the value of those losses. And 5 Points admits that it failed to disclose an expert to testify as to the amount of damages. The court will not credit Ms. Watkins purported lay testimony as to BDI's undisclosed expert opinion concerning repair costs. Absent any other proof of damages, the court finds that 5 Points' breach of contract claim is, "for all intents and purposes preordained to fail" at trial. *Dunn*, 2008 WL 11407404, *3. So the court will grant Frankenmuth's motion for summary judgment as to the breach of contract claim.

## **CONCLUSION**

As explained above, the court will deny 5 Points' motion to strike the affidavit of Jason Goodgame and the documents attached to it because

Frankenmuth's non-disclosure of those documents was harmless.

But the court will deny the parties' cross-motions for summary judgment as to the declaratory judgment claim because a genuine dispute exists as to whether the renovations to 5 Points' building occurred within 60 days before the loss. The court also denies 5 Points' motion because a genuine dispute exists as to whether Winn-Dixie and SEG conducted customary operations at 5 Points' building within 60 days before the loss.

The court will grant Frankenmuth's motion as to the breach of contract claim because 5 Points has not sufficiently shown that it can produce admissible evidence as to the amount of its damages.

And the court will find Frankenmuth's motion to strike to be moot.

**DONE** and **ORDERED** this 29th day of March, 2022.

_Karon O. Bowdre_
_____

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE